# OHIO NISI PRIUS REPORTS

## NEW SERIES—VOLUME XV.

---

CAUSES ARGUED AND DETERMINED IN THE SUPERIOR,
COMMON PLEAS, PROBATE AND INSOLVENCY
COURTS OF OHIO.

---

### ABATEMENT OF FACTORY NOISES IN A RESIDENTIAL NEIGHBORHOOD.

Common Pleas Court of Hamilton County.

HENRY F. GAU ET AL v. HOWARD M. LEY ET AL.

Decided, August 7, 1913.

*Injunction—Lies to Prevent Disturbing Noises which Affect Property Values—Abatement Decreed, Upon Petition of Nearby Residents, Against Noisy Operation of a Factory Making Architectural and Ornamental Iron.*

Where a factory is located in a residence neighborhood, after notice of strong objection thereto and efforts to prevent such location, and it is so operated as to give rise by the pounding and riveting of iron to continuous noises which interfere with conversation or the use of the telephone in the neighborhood and to produce actual physical discomfort to persons of ordinary sensibilities, and the evidence shows that by the use of improved machinery and modern methods much of the noise could be obviated, injunction will lie upon petition of property owners thus annoyed or injured for an abatement of the noise, notwithstanding a nearby railroad upon which many trains are operated contributes to the disquiet of the neighborhood.

*Heilker & Heilker* and *Ed. F. Alexander, for plaintiff.*
*W. A. Hicks* and *F. E. Wood,* contra,

GORMAN, J.

This action is one for an injunction to restrain the continuance of an alleged nuisance. Plaintiffs in their petition set out that they are acting for themselves and for others similarly situated, and say that they are and have been, for a number of years past, residents and owners of property on May street near Lincoln avenue in the city of Cincinnati, Ohio, being a high class, exclusively residential neighborhood; that May street and Lincoln avenue are improved with costly and valuable residences and have been so used exclusively for many years; that the homes on May street from Lincoln avenue south range in value up to thirty thousand dollars. They further allege that the defendants are the owners of several lots fronting on the south side of Lincoln avenue beginning at a point 150 feet east of May street, and in the year 1912 they built upon said lots a factory building within which they have been conducting and maintaining a blacksmith shop, machinery and appliances for handling, shaping and manufacturing structural, architectural and ornamental iron work, and that in the conduct of such business defendants continuously cause loud, disturbing, unusual and disagreeable noises to be made by hammering on iron, riveting iron rivets and shaping, moving and handling iron; that said noises disturb the order and peace and quiet of said neighborhood, rendering conversation and telephone communication difficult, and compelling the plaintiffs and others in the neighborhood to keep their windows closed during the day time, and rendering the premises of the plaintiffs and others in the neighborhood unfit for use and enjoyment in the ordinary manner; that said noises begin at seven o'clock in the morning and continue throughout the entire working day, thereby preventing plaintiffs' families and those in the neighborhood from enjoying sleep, rest or recreation, or enjoying the use of their premises, and affecting those who are sick in the neighborhood.

Plaintiffs further state that their premises have been greatly impaired and diminished in value, and that if the defendants are allowed to continue the production of these noises, the premises of the plaintiffs and others in the neighborhood will be ren-

dered unfit for residence purposes and plaintiffs will suffer great and irreparable injury.

They therefore pray for an injunction to restrain the defendants from carrying on their business in the manner in which it is alleged they are operating their plant and conducting their business at the present time.

The defendants have filed an answer admitting that the plaintiffs are and have been for a number of years owners and residents of property on May street near Lincoln avenue, and admitting that the defendants are the owners of the property on the south side of Lincoln avenue described in the petition, and that during the year 1912 they erected a manufacturing building thereon. They further set up that their factory also abuts on the line of the Cincinnati, Lebanon & Northern Railroad and the Norfolk & Western Railroad, and that the property on which their said building has been erected was and is not suitable for residence purposes, and that there are a number of business and manufacturing establishments along the line of said railroad and in the vicinity of defendant's building. They further aver that if there is any extreme, unusual, or disturbing noises in said neighborhood, that the same arise from the operation of said railroads, and not from the operation of defendant's business. They further aver that they are conducting in said building a plant for the fabrication of structural and ornamental iron; that the appliances and machinery used in such plant are the most modern and approved type and that any noise arising therefrom is not sufficient to disturb the peace and quiet of plaintiffs' homes. They deny each and every other allegation of the plaintiffs' petition.

The plaintiffs filed a reply to the answer of the defendants denying all the material allegations of the new matter therein set up.

The case came on to be heard before the court upon these pleadings and the evidence. There were thirty-four witnesses called by the parties, who testified as to the character, intensity and volume of the noises emanating from the defendants' plant. It would be neither profitable nor practicable to undertake to dissect and analyze the testimony of the witnesses and other

evidence in the case, consisting of plats and exhibits. The court will endeavor to state briefly the conclusions of fact and law in the case. The evidence discloses that in 1911, or the early part of 1912, the defendants in the case purchased a strip of property lying south of Lincoln avenue and east of May street, abutting upon the Cincinnati, Lebanon & Northern Railroad and about 150 feet eastwardly from May street. This property is situated probably 15 or 20 feet above the level of the railroad tracks, which tracks at this point are in a deep declension or ditch just north of the exit from the tunnel near Oak street. Their building fronts on Lincoln avenue on the south and extends southwardly a distance of perhaps 200 feet. It is a one-story building with a pressed brick front and concrete walls in the rear, with large windows which may readily be opened on the east, west and south sides; with a large double door opening on the south end of the building. These windows can be and are kept opened during the summer months and at other times when desirable. There is considerable machinery in the building, including a twenty-five horse power gasoline engine which furnishes the power for the plant. There is a driveway on the west side of defendants' plant leading from Lincoln avenue southwardly and around to the rear of the building and quite a large yard space on the south and east sides of the building.

Across the railroad from this plant and on a level with the railroad tracks is a coal tipple, but this coal tipple is seven or eight hundred feet away from the nearest residence on May street or Lincoln avenue. Two squares north of Lincoln avenue, on Shillito street, is the lumber yard of the Enterprise Lumber Company, which operates a circuar saw at times, but which makes very little noise and can not be heard ordinarily at the corner of Lincoln avenue and May street. The Banner Baking Powder Company has a plant on Stanton avenue about 1000 feet away from May street, but scarcely any noise whatsoever emanates from this plant. Some noise is made by the coal tipples when coal is unloaded from the cars into the hoppers, and wagons are loaded from the hoppers, but this noise from the coal tipple is not very intense and is scarcely heard on May street.

A great many railroad trains pass up and down on the double tracks of the Cincinnati, Lebanon & Northern Railroad Company with the usual puffing of the engine, rumbling of the trains, ringing of bells and blowing of whistles. These trains have been operated over these tracks for more than thirty years. There is no other manufacturing plant in the neighborhood of the plaintiff's property or within many blocks of it, excepting those above mentioned.

When the defendants were about to erect their plant, several of the residents on May street and Lincoln avenue sought to prevent it being done, and endeavored to purchase from the defendants the property so as to prevent the erection of this plant, but they were unable either to prevent the plant being erected or to purchase the property from the defendants. The defendants deliberately went into this neighborhood and erected their plant with the knowledge of the opposition which they would meet from the residents of that neighborhood. The residences on Lincoln avenue from the Reading road to the bridge are handsome, costly and beautiful homes, and those on May street are perhaps even more beautiful and costly. These residences have been occupied by the owners for many years with their families, in peace and quiet, with no noises except that from the moving of the trains in the rear of their property and slight noises that emanated from the coal tipple.

The evidence shows that from the time the defendants completed their building and occupied the same as a manufacturing plant, they have from time to time brought large quantities of iron girders, eyebeams, angle irons, plates and other kinds of structural and architectural iron into their premises, unloaded the same from wagons and cars in their yards and in their plant, which unloading was accompanied by great and disagreeable noises of clanging iron. They have also broken up in their yard and in their plant large quantities of second-hand iron by means of sledge hammers and chisels and other instruments, thereby causing intense, disagreeable and loud noises, which could be heard as far as 1,000 to 1,500 feet away from defendants' plant. They have also been hot riveting and cold riveting in the plant, and in some instances out in the yard, by means of

sledge hammers and small hammers. They have also been accustomed to "peening" out metal plates varying from one-half to three-quarters of an inch in length, which "peening" process consists in laying the metal plates upon a metal or iron table and using the curved small end or peen of the hammer to straighten out or smooth out buckled or creased plates, and the noise accompanying this operation is intense and disagreeable, and as some of the witnesses said, "pandemonium" itself.

These noises caused by these various operations of the plant and the various workings therein have been practically continuous during the day time from the time this plant was erected and in operation. The evidence further shows that the straightening of plates, smoothing them out, may be done by machinery without hammering them out, as is done in this plant. The defendants testified that the cost of a machine to do this work would not be more than $500 or $600.

The evidence further shows that there is no occasion for hot riveting with sledge hammers or other hammers, but that this may also be done by modern improved and approved machinery. There was evidence also tending to show that the cold riveting of plates may be done by machinery and need not be done by hammering. There was also evidence tending to show that the breaking up of structural iron may be avoided and that it is unnecesary to separate parts of iron by means of chisels and sledge hammers, but that separation may be done by sawing through the metal. In short, the testimony shows that practically all of the noises complained of by the petitioners can be avoided by the use of modern improved machinery, and that without very great cost or expense to the defendants.

The evidence shows that plaintiffs and many others living in the neighborhood, who have come before the court and testified, are unable to enjoy the use of their premises in the summer time, especially on their porches and in their yards, by reason of the continuous, loud and disagreeable noises caused by the clashing of metals in the defendants' plant. Members of the plaintiffs' families and others in the neighborhood who are sick and indisposed, have been rendered nervous and irritable, and

the members of the family have become solicitous about their nervous condition and their state of health.

Under this state of facts the question is, whether or not a court of equity has power to restrain the defendants from making the noises complained of, or if necessary to restrain entirely the operation of their plant which produces these noises.

*Wood on Nuisances,* Vol. 2, 3d Ed., Section 611, lays down the rule that:

"It is now well settled that noise alone, unaccompanied with smoke, noxious vapors or noisome smells, may create a nuisance and be the subject of an action at law for damages, in equity for an injunction, or of an indictment as a pubic offense." Citing the case of *Crimp* v. *Lambert,* L. R., 3 Eq. Cas., 409, and many other authorities.

The Superior Court of Cincinnati in General Term, in the case of *Shaw* v. *Queen City Forging Company,* and *Mears* v. *Queen City Forging Company,* 7 N. P., 254, held that the creation of noises by a plant operating a trip hammer was such a nuisance as a court of equity would enjoin upon the petition of the resident property owners in the neighborhood. Judge Dempsey, who announced the opinion of the General Term, went quite fully into the law of the case, and cited many authorities applicable to that case, which is similar to the case at bar.

In the case of *Dittman* v. *Repp,* 50 Md., 517, it was held that:

"Noise alone, if it be of such a character as to be productive of actual physical discomfort and annoyance to a person of ordinary sensibility, may create a nuisance and be the subject of an action at law or an injunction from a court of equity, though such noise may result from the carrying on of a trade or business in a town or city."

Many other decisions of like nature might be cited.

In the case at bar the court is of the opinion that the noises emanating from the defendants' plant are of such a character as to produce actual physicial discomfort and annoyance to persons of ordinary sensibility living in the neighborhood of the defendants' plant.

One of the first recorded cases which we have on the question of restraining the continuance of a nuisance is that of *Morley*

v. *Pragnel,* a decision of the King's Bench rendered in 1638, reported Cro. Car., 510, in which case the court laid down this rule: that every one ought to so use his own as not to injure others or the rights of others. And the latin maxim, *"sic utere tuo, quod alienum non laedos"* was followed in that case. That was a case in which the defendant directed and carried on a tallow-furnace, the stenches from which annoyed the plaintiff, and the continuance of that nuisance was found to be an indictable offense and adjudged to be removed.

The case of *Bliss* v. *Hall,* 4 Bing. (N. C.), 183, was an action to recover damages for a nuisance claimed to have been maintained by the defendant in carrying on the candlemaking business, which produced noxious vapors and smells and which annoyed the plaintiff and affected him and his property. In that case Justice Vaughan, in speaking of the right by prescription to continue the business and the production of noxious smells, said:

"The smells and noises of which the plaintiff complains are not hallowed by prescription, and under this plea the defendants can not justify their continuance."

And Justice Bosanquet said:

"I am of the same opinion. The defendant has, *prima facie,* a right to enjoy his property in a way not injurious to his neighbor; but here on his own showing the business he carries on is offensive, and he makes out no title to persist in the annoyance."

In the case of *Bamford* v. *Turnley,* Exchequer Chamber, reported 3 B. & S., page 62, a judgment was upheld in the case in which plaintiff brought an action to recover damages from the defendant for carrying on a brick-yard or brick kiln in the neighborhood of the plaintiff's property, causing noxious and unwholesome vapors, smoke and fumes to arise from the brick kiln to enter in and spread themselves upon and over plaintiff's property. The case was very fully considered by the Court of Appeals, and many of the justices put down their opinions, citing numerous cases to establish the rule above stated, *"sic utere tuo,"* etc.

In the famous case of *St. Helen's Smelting Company* v. *Tipping,* decided by the House of Lords, 1865, reported 11 H. L. C.;

642, the defendant operated and carried on a copper-smelting business near the residence of the plaintiff, causing large quantities of noxious gases and vapors to emanate therefrom to the injury of the plaintiff's property, his herbage and trees and shrubs, and to the detriment of the health of his cattle and the deprivation of the plaintiff to the beneficial use of his premises. The action was one for damages and it was held by the Lords upon the appeal and final hearing, that the verdict and judgment in favor of the plaintiff for damages was proper. In discussing the case the Lord Chancellor, among other things, says:

"In matters of this description, it appears to me that it is a very desirable thing to mark the difference between an action brought for a nuisance on the ground that the alleged nuisance produces material injury to the property, and an action brought for a nuisance on the ground that the thing alleged to be a nuisance is productive of sensible personal discomfort. With regard to the latter, namely, the personal inconvenience and interference with one's enjoyment, one's quiet, one's personal freedom, anything that discomposes or injuriously affects the senses or the nerves whether that may or may not be denominated a nuisance, must undoubtedly depend greatly on the circumstances of the place where the thing complained of actually occurs.  * * *  If a man lives in a street where there are numerous shops, and a shop is opened next door to him, which is carried on in a fair and reasonable way, he has no ground for complaint, because to himself individually there may arise much discomfort from the trade carried on in that shop. But when an occupation is carried on by one person in the neighborhood of another, and the result of that trade or occupation or business is a material injury to property, then there unquestionaby arises a very different consideration."

And again he says:

"And the only ground upon which Your Lordships are asked to set aside that verdict and to direct a new trial, is this, that the whole neighborhood where these copper-smelting works are carried on, is a neighborhood more or less devoted to manufacturing purposes of a similar kind, and therefore it is said, that inasmuch as this copper-cmelting is carried on in what the appellant contends is a fit place, it may be carried on with impunity, although the result may be utter destruction, or the very considerable diminution, to the value of the plaintiff's property. My Lords, I apprehend that that is not the meaning of the word

'suitable,' or the meaning of the word 'convenient,' which has been used as applicable to the subject. The word 'suitable' unquestionably can not carry with it this consequence, that a trade may be carried on in a particular locality, the consequence of which trade may be injury and destruction to the neighboring property."

The court is of the opinion that this statement of the Lord Chancellor effectually disposes of the claim of the defendants in this case, that because their plant is located in the neighborhood of a railroad and where some other manufacturing plants are located, that therefore the plaintiffs have no remedy against them on account of any noises which may be produced in the defendant's plant.

In the case of *Sturges* v. *Bridgman,* decided by the Court of Appeals in Chancery, 11 Ch. Div., 852 (1879), the plaintiff was a physician, who occupied a house on Wimpole street, London, with a garden behind the house. In this garden the physician erected a consulting-room. The defendant was a confectioner in large business, whose kitchen backed up against the consulting-room of the physician in the plaintiff's garden. So there was nothing between plaintiff's consulting-room and defendant's kitchen but the party-wall. The defendant in his kitchen had two large marble mortars set in brick-work, built up against the party-wall, and were worked by two large wooden pestles held in an upright position by horizontal bearers fixed into the party-wall, and were used for breaking up and pounding loaf-sugar and other hard substances and for pounding meat. The plaintiff alleged that when the defendant's pestles and mortars were being used, the noise and vibration thereby caused were very great and were heard and felt in the plaintiff's consulting-room, and that such noise and vibration seriously annoyed and disturbed the plaintiff and materially interfered with him in the practice of his profession. In particular the plaintiff complained that the noise interfered with his examining his patients for auscultation for diseases of the chest. He also found it impossible to engage in any occupation which required thought and attention. The defendant set up as a defense that he and his father had used one of the pestles and motars in the same place and to the same extent as now, for more than sixty years, and

he alleged that if the plaintiff had built his consulting-room with a separate wall and not against the defendant's kitchen, he would not have experienced any noise or vibration.    It was shown that the plaintiff, the physician, built his consulting-room a short time before the bringing of the action, and more than fifty years after the defendants had maintained their mortars and pestles in practically the same situation and operated in practically the same way.    Sir George Jessel issued an injunction restraining the defendant from operating his mortar and pestle to the annoyance of the plaintiff.    This judgment was on appeal affirmed by the Court of Appeals, and in this case the court took occasion to say that the length of time that an objectionable business had been carried on would give no right to the defendant to carry it on in an objectionable manner.

In the case of *Crump* v. *Lambert, supra*, Lord Romilly said:

"With respect to the question of law, I concede it to be established by numerous decisions * * * that noise alone * * * although not injurious to health, may severally constitute a nuisance to the owner of neighboring or adjoining property.    That if they do so, substantial damages may be recovered at law, and that this court  [Court of Chancery], if applied to, will restrain the continuance of the nuisance by injunction in all cases where substantial damages could be recovered at law."

A great number of cases will be found cited in *Wood on Nuisances,* Chap. 18, Sections 611 to 644 inclusive, 3d Ed., to which counsel are referred.    See also, Chap. 10, Sections 174 to 191 inclusive, of *Joyce on Nuisances,* wherein numerous authorities are cited holding that noises unaccompanied by vibrations, smoke or vapors, may be enjoined when they materially interfere with the comfort and enjoyment of residence property and substantially affect their enjoyment by persons of ordinary sensibilities.

In the case of *Davis* v. *Sawyer,* 133 Mass., 289, it was held that the habitual ringing of a bell may constitute a nuisance and may be enjoined, as in the case of a heavy factory bell which was rung at an early hour in the morning to rouse the operatives, and which disturbed the sleep of residents in the neighborhood.

It was held in the case of *Harrison* v. *St. Marks Church,* 12 Philadelphia, 259 (a famous case), that where the ringing of church bells causes a substantial annoyance and injury to oc-

cupants of adjoining premises it may be enjoined. Here it would seem that not even a house of worship may with impunity produce annoying noises by the ringing of bells even for the purpose of assembling the worshippers.

The blowing of steam whistles in factories may be enjoined, as was held in *Redd* v. *Edna Cotton Mills*, 136 N. C., 342. The only limitation which the Court of Chancery appears to have placed upon its power is that the noises shall be such as will substantially and materially affect the peace, quiet and comfort of persons of ordinary sensibility.

In *Clerk and Lindsell on Torts, page* 388, second paragraph, it is laid down as a rule that:

"Acts which are productive of mere personal discomfort may amount to an actionable nuisance, as, for instance, where the defendant creates stenches by the carrying on of an offensive manufacture or otherwise * * * or makes unreasonable noises upon his land or impairs the amenity of a neighborhood by vibration and noises, even though the nuisance be of a temporary character. * * *"

And in this volume pages 388 to 394 inclusive will be found citations of many cases in which the courts hold that noises which annoy and affect the comfort of persons of ordinary sensibility may be enjoined.

A very strong case is that of the *Appeal of Ladies' Decorative Art Club of Philadelphia,* 13 Atl. Rep., 537, where the court enjoined the pounding and hammering of brass in a residence neighborhood upon the ground that it tended to materially affect the comfort and enjoyment of the plaintiff's home. In that case the former owner of the plaintiff's property testified that he suffered no inconvenience from the noise. Other persons testified, as in the case at bar, that they were not annoyed by the noise emanating from the premises of the Decorative Art Club. In commenting on the testimony of the former owner of the plaintiff's property in the case just cited, the court says:

"It is true that Mr. Brush, who sold the plaintiff the house in which he lives, says in a brief affidavit that he was not seriously annoyed by the noise complained of while he resided there. Perhaps that is the reason why he was silent about the noise

when he sold to the plaintiff. It is certain that he did not men-
tion these noises to the plaintiff before he sold his house to him
and the witness may possibly be so constituted as not to be
easily troubled by noises of any kind.''

The court thinks that this language is applicable to the testi-
mony of one of the witnesses called on behalf of the defendants,
John C. Alander, who testified that he could sleep in a boiler
factory while the same was in operation without any discomfort
or annoyance to him.

In the case just cited the court further says:

''Mr. Heller, who teaches the languages for a certain time every
day in the front parlor of the house occupied by the defendants,
also says that he has not been troubled by the noises complained
of. But Mr. Heller might be of quite a different opinion, per-
haps, if he dwelt with a family in the house occupied by the
plaintiff.''

And so it may be said in this case, that many of the witnesses
who live on Oregon street and Stanton avenue, east and north
of the defendants' factory, might not be so willing to endure
the noises emanating from the defendants' plant if they resided
on May street or Lincoln avenue in the neighborhood of the
premises belonging to the plaintiffs.

In the case of *Froelicher* v. *Oswald Ironworks*, 111 La. Rep.,
706, it was held that:

''Acts which disturb physical comfort to an injurious extent,
may be restrained by interposition of the courts;'' and
''An offensive occupation can not be carried on to the very
great annoyance of the one dwelling immediately near.
''No one has the right to use his own land so as to render
that about him in any degree useless. His enjoyments must
have reference to the rights of others.''

In this case the court enjoined the defendant from operating
its blacksmith-shop in such a manner as to produce noises which
materially affected the enjoyment of the plaintiff's property.

In the case of *McMorran* v. *Fitzgerald*, 106 Mich., 649, an
injunction was issued to restrain the operation of a machine
shop devoted to boat repairing, situated in a neighborhood other-
wise given up to costly residences, and erected in the face of

protests, after the character of the locality as a residence district
had been established.

The court is of the opinion that the facts in the case just
cited and the law applied thereto, may well be cited as applying
with great force to the facts in the case at bar.

On page 652 of this report, the learned judge who announced
the opinion of the court, says:

"But when one invades a suburban district with an offensive
and noisy business, which from its nature is injurious to those
having homes in the vicinity, simply because he can purchase
the land cheap, or because the location has peculiar advantages
for his purpose, he takes the risk of being compelled to compen-
state the injured neighbors, or perhaps desist from the offensive
use of the property."

And again on page 653 the court says:

"As stated before, the situation was apparent but the defend-
ants purchased the premises for the purpose of erecting their
shop, and before its erection they were cautioned, and were
offered a large sum to abandon the project; but they insisted.
Further earnest of the complainants sincerity was given by the
commencement of a suit to restrain the operation of this plant.
But the defendants persisted, and could look at the matter only
from the standpoint of business, to which all other interests
should yield—a sentiment which is not uncommon, but one which
the law does not sanction."

Many other cases might be cited by the court in support of
the claim of the plaintiffs that an injunction should issue in this
case to restrain the carrying on of the defendants' business
to the annoyance of the plaintiffs and those in the neighborhood
of the defendants' plant. But the court is of the opinion that
the cases cited are sufficient to sustain the contention of the
plaintiffs.

Counsel for the defendants have cited the case of *Goodall* v.
*Crofton*, 33 Ohio St., 271, and the case of *Grothlich* v. *Klein et
al*, 13 C.C.(N.S.), 335, in support of their contention that no
injunction should be issued in this case unless the right to the
same has been clearly established, and that the noises from

the plant of the defendants are not, under the circumstances, such as constitute a nuisance under the law.

As to the case of *Goodall* v. *Crofton, supra,* it was pointed out by the Superior Court in General Term, in *Shaw* v. *Forging Company, supra,* that the facts in that case were, that a landlord whose property was rented to tenants for income producing purposes, was being injured in its rental value by the operation of the defendants steam engine and machinery in an adjoining marble yard, leaving no doubt in the minds of the court but that the injury sustained by reason of the alleged nuisance in that case could be compensated for in an action for damages. That rule would not apply to a case where the plaintiff was occupying his premises as a residence and not renting it out to others for revenue purposes, because in the latter case, as the court very properly said in 33 Ohio St., 271, adequate damages for the diminished value of the property could be recovered in an action at law.

In the case of *Grothlich* v. *Klein, supra,* the facts stated by the court are so meager that we doubt very much if the case may be held to be an authority in point. Judge Giffen, in stating the facts, says:

"It appears from the testimony and a view of the premises, including the power-shears in operation, that the chief noise arises from the cog-wheels forming a part of the gearing, and that there is no substantial vibration affecting plaintiff's property. * * * The business itself is lawful and conducted in an ordinary prudent manner. Such annoyance as the plaintiff suffers is no greater than is endured in any populous neighborhood devoted, as this is, in part to manufactures, and to grant the relief by injunction would practically suspend manufacturing within the city limits."

And again he says:

"There is and can be no real injury to the property itself, and while the annoyance to the plaintiff and her tenants is substantial, it does not amount to a nuisance for which an injunction should be granted."

It would appear therefore, from the statement of the learned court in this case, that no substantial annoyance was suffered

by the plaintiff on account of noises emanating from the defendant's plant.

In the case at bar the court heard the testimony during several days of numerous witnesses. The court also visited the plant upon one occasion with counsel, and saw it in operation. Upon another occasion, he was in the neighborhood of the plant, though not inside. And from his observation, as well as from the evidence in the case, he has no hesitancy is saying that the noises emanating from the defendant's plant constitute an intolerable nuisance to the people who reside in the neighborhood.

He is also of the opinion that most of these noises may be easily avoided by operating the plant in accordance with modern methods and modern machinery.

In conclusion, the court is of the opinion that the prayer of the petitioners should be granted to this extent: the defendants should be enjoined from peening out their plates by hammers; they should be enjoined from breaking up with sledge hammers or other appliances old or new iron in their yard, or in their plant; they should be enjoined from cold chiseling eyebeams, girder and plates, or any other metal substances which can be separated by sawing or clipping by machinery; they should be enjoined from hot riveting by means of sledge hammers or other hammers; they should be required to do their hot riveting by machinery which produces no noise; they should be enjoined from cold riveting their plates by means of small hammers; and they should be required to do this riveting by means of compressors or the squeezing process, which the evidence shows can be practicably done by modern improved machinery.

If this plant can not be operated without producing noises which substantially affect the peace and comfort of the plaintiffs and those in the neighborhood of the plaintiff, then the entire operation of the plant should be enjoined.

The court will allow the defendants a period of sixty days from this date to arrange its business affairs so that its plant may be operated in accordance with the findings of the court. An injunction will be issued in accordance with the conclusions reached.